IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY BERMAN,

      Plaintiff,

      v.

CENTRAL INTELLIGENCE AGENCY,

      Defendant.

CIV-S-04-2699 DFL-DAD

MEMORANDUM OF OPINION
AND ORDER

Plaintiff Larry Berman ("Berman") brings this suit to challenge defendant Central Intelligence Agency's ("CIA") denial of his request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for two editions of the President's Daily Briefs ("PDB").  The parties have filed cross-motions for summary judgment.  For the reasons given below, the court GRANTS summary judgment in favor of the CIA.

I.

Berman is a professor of political science at the University of California, Davis and a historian of the American presidency and the Vietnam war.  (Pl.'s Mot. at 2.)  On March 2, 2004, Berman requested disclosure of four PDBs from President Lyndon B.

1

Johnson's term of office.  (Id.)  By letter dated April 15, 2004,

the CIA denied the request based on FOIA Exemptions 1, 3, and 5.

(Id.)  After exhausting available administrative appeals, Berman

brings this suit seeking disclosure of two of the PDBs, dated

August 6, 1965 and April 2, 1968.[1]  (Id. at 3.)

The PDB is a "unique intelligence document prepared

specifically for the President of the United States and his most

senior advisors."  (Buroker Decl. ¶ 16.)  Although its format has

changed slightly since its inception during the Kennedy

Administration, its general purpose has always been to "to select

the most sensitive data and provide the best intelligence

judgments available in order to give the President and his top

advisors the most accurate, comprehensive, and timely information

needed to make national defense and foreign policy decisions for

the country."[2]  (Id. ¶ 17.)

The contents of the PDB are determined by the leadership of

the CIA and reflect an ongoing dialogue between the President and

the CIA concerning national security.  (Id. ¶¶ 18, 19.) The PDB

---

[1]  In the FOIA request, Berman sought disclosure of four
PDB's, including March 31, 1968 and August 8, 1965.  He has not
included the August 8, 1965 PDB, if any, in the present
complaint.  As to the March 31, 1968 request, the CIA has stated
that no PDB was prepared for that day.  (Buroker Decl. ¶ 9.)
Accordingly, there are only two PDBs still at issue in this suit:
the PDBs of August 6, 1965 and April 2, 1968.

[2]  The first incarnation of the PDB was called the
President's Intelligence Checklist.  (Buroker Decl. ¶ 17.)  It
was renamed the PDB during the Johnson Administration.  (Id. ¶
18.)  In this opinion, the court will refer to both documents as
PDBs.

prompts the President and his senior advisors to ask for further information, and these inquiries in turn affect the content of future PDBs as well as the CIA's conduct of intelligence "on a daily and long-term basis."[3]  (Id. ¶¶ 19, 35-37.)

Because of its limited distribution, the PDB contains more immediate and restricted information than is included in other national security documents.  (Id. ¶ 21.)  For instance, PDBs include: (1) "raw operational information, sometimes including true names of sources" that has not been disseminated to other intelligence agencies; (2) sensitive information that is restricted at the "very highest levels of human and technical source intelligence gathering"; (3) information from covert operations; and (4) information derived from CIA-only methods. (Id.)

Although the vast majority of the PDBs have not been released by the CIA, several sanitized PDBs, or portions thereof, have been released to the public in various forms. (Buroker Decl. Ex. ¶ 14.)  Specifically, twelve PDBs were released either at the direction of an Executive Order (in the case of the two

_____

[3]  Berman contends that, unlike other presidents, a "briefer" from the CIA was not physically present when President Johnson read the PDBs. (Pl.'s Mot. at 3.)  From this absence, Berman concludes that the CIA did not receive questions and comments from President Johnson in the manner generally described by Buroker's declaration.  (Id.)  However, the documentation submitted by Berman shows that President Johnson did regularly communicate his reactions, criticisms, and requests concerning the PDBs to the CIA through one of his top aides.  (Blanton Decl. Ex. 3.)  Thus, the PDBs did reflect an on-going dialogue between the CIA and the President, even during the Johnson Administration.

3

PDBs released at the request of the 9/11 Commission) or pursuant to the John F. Kennedy Assassination Records Collection Act of 1992. (Id. ¶ 30 n.4.)  Additionally, at least six other PDBs have been released by mistake.  (Id.)  Berman asserts that the number of released PDBs is somewhat higher, at about 35.  (Pl.'s Mot. at 4.)  He includes as exhibits copies of 16 PDBs from the Johnson Administration that have been released, including the PDBs dated a day after (August 7, 1965) and a day before (April 1, 1968) the two PDBs requested in this case.  (Id.; Blanton Decl. Exs. 4-5.)

In addition to the PDBs, the CIA also prepares a daily Central Intelligence Bulletin ("CIB").  (Buroker Supp. Decl. ¶ 4.)  Unlike the PDB, the CIB is prepared for senior policy and security officials throughout the government and is not necessarily directed to the President's current priorities. (Id.)  Several thousand CIBs have been released by the CIA in redacted form.  (Pl.'s Mot. at 5.)

## II.

The FOIA requires disclosure of government records unless the requested information falls within one of nine enumerated exemptions.  5 U.S.C. § 552(b).  As to its decision to withhold the two PDBs, the CIA relies principally on the interaction between the National Security Act and Exemption 3 which exempts information "specifically exempted from disclosure by statute" if the statute "leave[s] no discretion on the issue," "establishes particular criteria for withholding" the information, or "refers

to particular types of matters to be withheld."  5 U.S.C. §
552(b)(3).[4]  Under the National Security Act, the Director of
Central Intelligence is responsible for "protecting intelligence
sources and methods from unauthorized disclosure."  50 U.S.C. §§
403-3(c)(7), 403g (2004).[5]  In CIA v. Sims, 471 U.S. 159, 167,
105 S.Ct. 1881 (1985), the Court held that this statutory
language "clearly 'refers to particular types of matters,' . . .
and thus qualifies as a withholding statute under Exemption 3."
The CIA contends that because the release of the requested PDBs
would reveal information about intelligence sources and methods,
the release is prohibited by the National Security Act and hence
covered by Exemption 3 of the FOIA.  (Def.'s Mot. at 8.)

     The CIA bears the burden of proving that the withheld
information falls within the Exemption.  Minier v. CIA, 88 F.3d
796, 800 (9th Cir. 1996).  However, the CIA's judgment that the
disclosure of certain information could reveal intelligence
sources and methods is entitled to great deference.  The National
Security Act in tandem with Exemption 3 of the FOIA provide "very
broad authority to protect all sources of information from

---

     [4]  The CIA also asserts that the requested PDBs are covered
by Exemptions 1 and 5 of the FOIA.  The court finds it
unnecessary to examine the arguments on Exemption 1.

     [5]  In their papers, the parties agree that these are the
relevant statutes because they were the ones in effect at the
time Berman's FOIA request was made. Since then, the
responsibility to protect intelligence methods and sources
against unauthorized disclosures has been transferred to the
Director of National Intelligence.  See Intelligence Reform and
Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 1011,
118 Stat. 3638 (2004).

1  disclosure."  Hunt v. CIA, 981 F.2d 1116, 1119 (9th Cir. 1992).

2  Indeed, the authority to protect sources and methods is so broad

3  that it amounts to a "'near-blanket FOIA exemption [for the

4  CIA],' which is 'only a short step [from] exempting all CIA

5  records from FOIA." Minier, 88 F.3d at 801 (quoting Hunt, 981

6  F.2d at 1119-20). The court must defer to the CIA's conclusion

7  that the release of certain information could impair its mission

8  by revealing its sources and methods: "[I]t is the

9  responsibility of the Director of Central Intelligence, not that

10 of the judiciary, to weigh the variety of subtle and complex

11 factors in determining whether disclosure of information may lead

12 to an unacceptable risk of compromising the Agency's

13 intelligence-gathering process." Sims, 471 U.S. at 180.

14      To justify invocation of Exemption 3, the Agency "may meet

15 its burden by submitting a detailed affidavit showing that the

16 information 'logically falls within the claimed exemptions.'"

17 Minier, 88 F.3d at 800 (quoting Hunt, 981 F.2d at 1119). The

18 affidavit is entitled to "substantial weight," provided that the

19 affidavit: (a) describes the documents and the justifications for

20 nondisclosure with reasonably specific detail; (b) demonstrates

21 that the information withheld falls within the claimed exemption;

22 and (c) is not controverted either by contrary evidence in the

23 record or by evidence of agency bad faith. Hunt, 981 F.2d at

24 1119 (citing Gardels v. CIA, 689 F.2d 1100, 1105 (D.C. Cir.

25 1982)). Of course, the affidavit "need not specify its

26 objections [to disclosure] in such detail as to compromise the

6

1  secrecy of the information."  Lewis v. IRS, 823 F.2d 375, 378

2  (9th Cir. 1987).

3      In this case, the CIA has submitted a forty-page declaration

4  from Terry Buroker ("Buroker"), the Information Review Officer

5  for the CIA, in support of its summary judgment motion.  The sole

6  question is whether, in light of the declaration, the CIA's

7  conclusion that disclosure of the two requested PDBs could reveal

8  CIA intelligence sources or methods "survives the test of

9  reasonableness, good faith, specificity, and plausibility in the

10  field of foreign intelligence in which the CIA is expert and

11  given by Congress a special role."  Gardels, 689 F.3d at 1105.

12      The CIA asserts that the release of the requested PDBs would

13  reveal important information about U.S. intelligence sources and

14  methods in three ways.  (Def.'s Mot. at 8.)  First, the requested

15  PDBs contain information that, by itself or in connection with

16  other information, could expose the existence of sensitive

17  sources and methods of intelligence collection, including human

18  sources, foreign liaison sources, and technical collection

19  methods.  (Buroker Decl. ¶ 34.)  For instance, the CIA states

20  that the requested PDBs contain "explicit references to

21  information provided by foreign officials as well as other

22  information that may incorporate information from foreign liaison

23  relationships."  (Id. ¶¶ 49, 54.)  Additionally, the CIA claims

24  that release of the PDBs would disclose specific intelligence

25  methods, including technical collection methods.  (Id. ¶ 59.)

26      Second, the CIA argues that the PDB itself is an

1    intelligence method.  (Id. ¶¶ 35-37.)  The CIA considers the PDB

2    an integral part of the process by which the CIA advises the

3    President and his most senior advisors regarding the subject

4    areas most important to them and then receives guidance on where

5    to focus its resources and energy.  (Id.)  In this way, it

6    argues, the PDB is no less an intelligence method than the CIA

7    budget, which has been held exempt from disclosure as an

8    intelligence method.  See Aftergood v. CIA, 355 F.Supp.2d 557,

9    562 (D.D.C. 2005).

10        Third, the CIA relies on the "mosaic theory," a method by

11   which all intelligence agencies collect "seemingly disparate

12   pieces of information and assembl[e] them into a coherent

13   picture."  (Buroker Decl. ¶ 27).  The CIA argues that disclosure

14   of the information in the requested PDBs, in addition to any

15   other PDBs released in the future, would allow enemies of the

16   United States to construct an accurate picture of U.S.

17   intelligence sources, methods, targeting priorities, and

18   capabilities.[6]  (Id. ¶¶ 38-39.) The unique nature of the PDB

19   makes it an especially large piece of any "mosaic" because it is

20   the only finished intelligence product that synthesizes all of

21   the best available intelligence on topics that the President, his

22

23        [6] "If significant numbers of individual editions of the PDB
24   (no matter how old) were publicly disclosed, even after redaction
     of the obvious revelations of specific collection methods and
25   sources, due to regular or even sporadic disclosure (by CIA
     policy or court order), patterns of application of intelligence
26   methods including those by which the U.S. sets priorities,
     collects intelligence, and analyzes it would emerge." (Id. ¶
     38.)

top advisors, and the leadership of the CIA have determined to be the most important foreign policy issues facing the country at a given time.  (Id.)

Berman challenges the CIA's declaration on several grounds.[7] He attacks the specificity of the Buroker declaration, arguing that the declaration is overly general because it fails to articulate exactly how the requested PDBs will reveal an intelligence source or method.  (Pl.'s Mot. at 9-10.) However, this level of specificity is not required by Exemption 3 and the case law interpreting it.  Given that Buroker's declaration is part of the public record, it must necessarily claim the Exemption in terms that are general and that do not reveal either specific intelligence information or the particular aspect of the PDBs that is of concern to the Agency.  See Lewis, 823 F.2d at 378 (agency "need not specify its objections [to disclosure] in such detail as to compromise the secrecy of the information").

---

[7]  As an initial matter, Berman contends that Buroker is not competent to testify regarding the mosaic theory because such a theory depends on an understanding of the information already available to foreign governments and how that information could be used by foreign governments to discover sources of intelligence methods.  (Pl.'s Reply at 3.)  However, this contention runs counter to the numerous cases allowing an agency to submit a declaration from an agency official with responsibility for coordinating the agency's decisions on FOIA requests where that official has personal knowledge of the procedures used in handling the FOIA request at issue and is familiar with the documents in question.  See Spannaus v. DOJ, 813 F.2d 1285, 1289 (4th Cir. 1987).  Buroker is the Information Review Officer for the Director of Intelligence ("DI").  In that capacity, he is responsible for the final review of documents containing information implicating DI interests when such documents are requested under the FOIA.  (Buroker Decl. ¶¶ 1-2.) The court finds Buroker competent to testify on these issues.

1   Moreover, unlike declarations that have been found inadequate in

2   other cases, the Buroker declaration is not fairly described as

3   "boilerplate," as involving "categorical indication[s] of

4   anticipated consequences of disclosure," or as making no effort

5   to "tailor the explanation to the specific document withheld."

6   Wiener v. FBI, 943 F.2d 972, 978-79 (9th Cir. 1991).  For

7   instance, in Wiener, the court found the declaration's sole

8   statement that "disclosure of [the withheld] portions reasonably

9   could be expected to lead to identification of the source of

10  information" to be insufficiently specific to support an

11  Exemption 3 claim because it failed to discuss the facts or

12  reasoning upon which the agency based its conclusions.  Id. at

13  983.  See also Allen v. CIA, 636 F.2d 1287, 1294 (D.C. Cir. 1980)

14  (finding CIA declaration insufficient to support Exemption 3

15  claim because declarations were "conclusory" and "do little more

16  than parrot the language of [the statute] by stating that

17  'intelligence sources and methods' will be compromised if the

18  document is disclosed").  By contrast, Buroker's declaration

19  articulates three specific ways in which the release of the

20  requested PDBs will reveal intelligence sources and methods and

21  describes the rationale behind these assertions in reasonable

22  detail.  Accordingly, the court finds the CIA's declaration

23  sufficiently specific.

24      Berman also takes issue with the substance of the Buroker

25  declaration and the persuasiveness of the CIA's claim that the

26  PDBs could reveal intelligence sources and methods.  His basic

argument is that the CIA's reasons for withholding the two PDBs are implausible given the numerous PDBs and CIBs that have already been released.  (Pl.'s Mot. at 3.)  Berman contends that the release of these other PDBs undercuts the CIA's contention that release of the requested PDBs will reveal the secret of the PDB as an intelligence method, as any "secret" has already been released.  (Id.)  Moreover, Berman asserts that the significant amount of information already released by the CIA concerning its intelligence assessments during the Vietnam war -- including the PDBs from a day before and a day after the requested PDBs and thousands of CIBs from the Johnson Administration -- contradicts the CIA's claim that release of two additional PDBs could disclose any source or method not already disclosed.  (Pl.'s Reply at 4.)

Berman has a formidable burden in challenging the CIA's evaluation of the "variety of subtle and complex factors in determining whether disclosure" may damage its intelligence-gathering process.  See Sims, 471 U.S. at 180.  Whether to disclose further information of a certain kind, when there has been some disclosure already, whether intentional or unintentional, is precisely the sort of judgment call that the statute reposes in the Director of the CIA.  Moreover, Berman's evidence of other PDB and CIB disclosures does not demonstrate that the Agency's conclusion is implausible or unreasonable.  The CIA states that the requested PDBs contain information different from that contained in previously disclosed PDBs.  (Buroker Decl.

¶ 62; Buroker Supp. Decl. ¶¶ 3-4.)   Additionally, the CIA

maintains that PDBs are significantly different than CIBs, and

that a comparison between the two is not appropriate.  (Buroker

Supp Decl. ¶ 4.)  Specifically, the CIA notes that the CIB is not

prepared exclusively for the President and his top advisors and

does not contain raw intelligence or direct source information.

(Id.)  Finally, that some PDBs have been released, whether

deliberately or by mistake, does not undercut the CIA's claim

that each additional disclosure puts foreign intelligence

agencies in a better position to understand the PDB process.

PDBs are not uniform in their format or structure.  (Buroker

Decl. ¶ 19.)  Accordingly, release of some PDBs does not

necessarily reveal the entire "method" of the PDB or require that

all PDBs must now be released.  For these reasons, the court

finds that Berman's evidence does not cast the CIA's position as

unreasonable, implausible, or in bad faith.

   Berman's argument is essentially one of waiver:  by

releasing other PDBs and CIBs, the CIA has waived its right to

withhold any PDBs, including the present documents.  However,

courts have rejected similar arguments where the requested

documents contain information not included in the released

documents.  Sims, 471 U.S. at 180.  As the Court held in Sims,

> Congress did not mandate the withholding of information
> that may reveal the identity of an intelligence source;
> it made the Director of Central Intelligence
> responsible only for protecting against *unauthorized*
> disclosures.  The national interest sometimes makes it
> advisable, or even imperative, to disclose the
> information that may lead to the identity of
> intelligence sources.  And it is the responsibility of

the Director of Central Intelligence, not that of the
judiciary, to weigh [these various factors].

Id. (emphasis in original); see also Aftergood, 355 F.Supp.2d at
563-64; Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990).
Congress, the CIA, and the President have decided to release
certain PDBs for particular public policy reasons.  It does not
follow that all PDBs should be released, and a court should
hesitate before embracing a logic that could harm the national
security, remove Agency discretion to disclose some information
without disclosing all other information of a similar kind, and
punish the Agency for making prior disclosures, when disclosure
is the very goal of the FOIA.  For these reasons, Berman's
argument is not persuasive that because other PDBs have been
released, so should the two at issue here.

Berman also challenges the sufficiency of the mosaic theory
relied on by the CIA as one of its three reasons for invoking
Exemption 3.  Berman argues that reliance on the "mosaic theory"
is inadequate to support the claim that seemingly innocent
information, when viewed in conjunction with other information,
could reveal intelligence sources or methods. (Pl.'s Mot. at 11.)
However, the case he relies on for this proposition, Detroit Free
Press v. Ashcroft, 303 F.3d 681 (6th Cir. 2002), is not an FOIA
case, but a deportation case involving First Amendment and
personal liberty interests.  In contrast, numerous courts have
recognized the legitimacy of the mosaic theory in the context of
the FOIA.  See Sims, 471 U.S. at 178 ("In this context, the very

nature of the intelligence apparatus of any country is to try to find out the concerns of others; bits and pieces of data 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'"); Hunt, 981 F.2d at 1119 (recognizing validity of mosaic theory); Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 928-29 (D.C. Cir. 2003) (same).  Again, deference to the Agency is required. There is no showing that the CIA's decision that the PDBs contain bits and pieces of information that could assist another intelligence agency is made in bad faith or is unreasonable.

In addition, Berman argues that the age of the requested documents undercuts the CIA's concern about possible disclosure of intelligence sources and methods. (Pl.'s Mot. at 12.) However, Buroker specifically addresses the age of the documents in his declaration.  He states that intelligence information does not automatically lose its need for protection after a period of thirty years because sources may still be alive and in position. (Buroker Decl. ¶ 55.)  Additionally, he asserts that, despite their age, disclosure of the requested documents would reveal to educated observers information about the application of intelligence methods in use at the time of the requested PDBs and thereafter.  (Id. ¶ 62.)  This is a plausible and reasonable explanation that is entitled to deference.

Moreover, courts have generally affirmed the CIA's position concerning the effect of age on intelligence information.  Courts have consistently held that the passage of time does not bear on

the CIA's entitlement to withhold documents under Exemption 3

based on the National Security Act.  E.g., Fitzgibbon, 911 F.2d

at 764; Maynard v. CIA, 986 F.2d 547, 555 n.6 (1st Cir. 1993)

(involving thirty-year old documents).  Recognizing that "courts

have generally rejected the contention that the mere age of

intelligence information rules out Exemption 3," the Maynard

court explained that:

> [r]eluctance stems from recognition that it is
> virtually impossible for an outsider to ascertain what
> effect the passage of time may or may not have had to
> mitigate the harm from disclosure of sources and
> methods. . . . The CIA, not the judiciary, is better
> able to weigh the risks that disclosure of such
> information may reveal intelligence sources and methods
> so as to endanger national security.

Maynard, 986 F.2d at 555 n.6.[8]

Finally, Berman submits several declarations from

knowledgeable persons who state their belief that disclosure of

historic PDBs would not reveal sources or methods, especially in

light of the other PDBs and CIBs that have already been released.

(Pl.'s Mot. at 4-5.)  Additionally, he notes that the CIA's

Historical Advisory Committee and the U.S. State Department's

Historical Advisory Committee on Diplomatic Documentation have

---

[8] Berman incorrectly asserts that no court has applied the mosaic theory to information over thirty years old.  See Aftergood, 355 F.Supp.2d at 563 (relying in part on the mosaic theory in upholding the CIA's refusal to disclose CIA budget information from 1947 to 1970); Assassination Archives and Research Ctr. V. CIA, 177 F.Supp.2d 1, 7-9 (D.D.C. 2001) (finding CIA's affidavit sufficient where it stated that release of a 1962 compendium of intelligence would endanger intelligence sources and methods).

recommended that historic PDBs, such as the ones here, be

reviewed for release to the public. (Id.)  However, review is

not the same as release and the views of private citizens, even

of eminent and well informed persons, are not entitled to the

deference accorded to those who have the statutory duty to

protect intelligence sources and methods.  See Assassination

Archives and Research Ctr v. CIA, 334 F.3d 55, 57-59 (D.C. Cir.

2003.

    In sum, in light of the deference that must be given to the

CIA's judgment as to what is or could reveal an intelligence

source or method, the court finds that the CIA's declaration is

as specific as it can be on the public record, provides

reasonable and plausible grounds for withholding the documents

under Exemption 3, and is not controverted by other evidence.

The court therefore finds that the requested documents are

covered by Exemption 3.

_____III.

    The CIA also relies upon Exemption 5 which permits an agency

to withhold from the public "inter-agency or intra-agency

memorandums or letters which would not be available to a party by

law other than an agency in litigation with the agency."  5

U.S.C. § 552(b)(5).  This exemption shields "those documents, and

only those documents, normally privileged in the civil discovery

context."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149, 95

S.Ct. 1504 (1975).  The ability of any particular litigant to

override a privilege claim set up by the government is not

relevant to  Exemption 5 analysis; rather, "[t]he test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance."  FTC v. Grolier Inc., 462 U.S. 19, 26, 103 S.Ct. 2209 (1983); Sears, Roebuck & Co., 421 U.S. at 149 n.16.  The CIA invokes Exemption 5 based on the presidential communications privilege.[9]

The court finds that the requested documents are covered by Exemption 5 based on the presidential communications privilege. The Supreme Court has recognized a "presumptive privilege for Presidential communications" founded on the "President's generalized interest in confidentiality."  United States v. Nixon, 418 U.S. 683, 708, 711, 94 S.Ct. 3090 (1974) ("Nixon I"). The Court "found such privilege necessary to guarantee the candor of presidential advisers and to provide '[a] President and those who assist him . . . [with] free[dom] to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." In re Sealed Case, 121 F.3d 729, 743 (D.C. Cir. 1997) (quoting Nixon I, 418 U.S. at 708).

The privilege applies to former, as well as current, Presidents, but is "limited to communications 'in performance of [a President's] responsibilities' 'of his office,' and made 'in the process of shaping policies and making decisions.'"  Nixon v.

---

[9]   The CIA also invokes Exemption 5 based upon the deliberative process privilege.  Because the court finds that the requested documents are covered by the presidential communications privilege, it need not address the applicability of the deliberative process privilege.

Adm'r of Gen. Servs., 433 U.S. 425, 449, 97 S.Ct. 2777 (1977)

("Nixon II").  The privilege "applies to documents in their

entirety, and covers final and post-decisional materials as well

as pre-deliberative ones."  In re Sealed Case, 121 F.3d at 745.

Here, the requested documents represent communications directly

to the President used in the conduct of his official duties.

Therefore, the requested documents fall within this privilege.

     Berman challenges the CIA's invocation of the presidential

communications privilege on three grounds.  First, Berman argues

that the requested PDBs are not "inter-agency" or "intra-agency"

documents because they were prepared for the President, and the

President is not an "agency" for purposes of the FOIA.  (Pl.'s

Mot. at 17.)  The documents are not intra-agency documents,

Berman contends, because they were not addressed "both to and

from employees of a single agency."  (Id.)  Likewise, the

documents are not inter-agency because the President is not an

agency and, therefore, communications from the CIA to the

President are not inter-agency.  (Id.)

     This argument has little merit.  For one, Congress "did not

intend 'inter-agency' and 'intra-agency' to be rigidly exclusive

terms, but rather to include any agency document that is part of

the deliberative process."  Ryan v. DOJ, 617 F.2d 781, 790 (D.C.

Cir. 1980).  More importantly, under well established case law,

Exemption 5 has been applied to documents, like the ones here,

prepared by an agency addressed to the President.  For example,

in EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827 (1973), the Court found

that "it was beyond question" that documents prepared by a committee within the National Security Agency to aid the President in making a certain decision "are 'inter-agency or intra-agency' memoranda or 'letters'."[10]  Id. at 85; see also Binion v. DOJ, 695 F.2d 1189, 1193 (9th Cir. 1983) (finding that documents prepared for the President by the Office of the Pardon Attorney fell within Exemption 5).  Congress exempted the President from the definition of an "agency" under FOIA because it wanted to protect the President from the burdens and intrusions of FOIA, not because it sought to deny the President the protections afforded by the exemptions for information communicated to the President but retained in an agency file. See, e.g., Armstrong v. Exec. Office of the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993).

Second, Berman asserts that the CIA lacks standing to assert the presidential communications privilege, arguing that only the President can assert this privilege.  (Pl.'s Mot. at 22.)  This argument is also incorrect.  Even assuming the President must personally invoke the presidential communications privilege in

---

[10]  Berman's reliance on Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 121 S.Ct. 1060 (2001), is not persuasive.  Klamath did not involve documents produced by an agency for the benefit of the President.  Rather, it involved communications between an agency and a non-governmental entity "representing interests of its own" in a negotiation with the agency.  Id. at 10-12.  Klamath holds that the "intra-agency" condition excludes communications to or from an interested, outside party; it does not discuss whether documents produced by an agency for the benefit of the President fall within Exemption 5.

civil discovery,[11] this requirement should not be imported into the FOIA context.  See  Lardner v. DOJ, No. 03-0180, 2005 WL 758267 (D.D.C. March 31, 2005).

Most importantly, Berman's argument is at odds with the established principle that Exemption 5 protects from disclosure documents that "fall within the ambit of a privilege" such that they would not be "routinely or normally" disclosed in civil discovery upon a showing of relevance.  Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7, 121 S.Ct. 1060 (2001).  This principle creates "a divide between the rules of FOIA and civil discovery."  Lardner, 2005 WL 758267, at *6.  Specifically, courts interpreting Exemption 5 focus on the content or nature of the document, as opposed to the manner in which the exemption is raised in a particular situation.  See Dow Jones & Co., Inc. v. DOJ, 917 F.2d 571, 575 (D.C. Cir. 1990) (emphasizing that the application of Exemption 5 in the context of the deliberative process privilege "depends on the factual content and purpose of the requested document" as opposed to other variables).  Requiring the President personally to invoke the presidential communications privilege in the Exemption 5 context would run counter to this focus on the content of the document.

---

[11]  It is not clear that this is the law.  In In re Sealed Case, a non-FOIA case, the D.C. Circuit stated that the case law "might suggest" that the President must assert the presidential communications privilege personally.  121 F.3d at 745 n.16.  However, it did not decide the issue because the record indicated that the President invoked the privilege in that case.  Id.

Second, "[t]here is no indication in the text of the statute or elsewhere that Congress anticipated -- much less demanded -- that the decision to withhold documents under Exemption 5 would need to be made personally by the head of the agency (in this case the President). . . . The practice for decades has been otherwise." Lardner, 2005 WL 758267, at *8.  For example, although the deliberative process privilege requires invocation by a high-level agency official in civil discovery, see Landry v. FDIC, 204 F.3d 1125, 1135-36 (D.C. Cir. 2000), courts routinely accept declarations from an employee at the agency other than a high-level official as documentation of an Exemption 5 claim. See, e.g., Norwood v. FAA, 993 F.2d 570, 572 (6th Cir. 1993) (assistant general counsel for litigation at the Department of Transportation).

Finally, requiring the President to personally examine the documents and invoke the presidential communications privilege every time a citizen seeks presidential records through the FOIA would expose the President to considerable burden.  Lardner, 2005 WL 758267, at *9.  Congress would not have intended to impose such a burden, given that it specifically intended the President and his immediate staff to be immune from FOIA requests.  See, e.g., Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 156, 100 S.Ct. 960 (1980) (holding that the "legislative history is unambiguous" that the Office of the President is not an agency and subject to FOIA).  For the above reasons, the court finds that the CIA may invoke the presidential

communications privilege in the FOIA context.

Third, Berman argues that the requested documents are not protected by the presidential communications privilege because the passage of time has abrogated any such privilege. (Pl.'s Mot. at 22-23.)  This argument is also unconvincing.  The Supreme Court has stated that the expectation of the confidentiality of executive communications is subject to erosion over time after an administration leaves office.  <u>Nixon II</u>, 433 U.S. at 451. However, no court has put a specific time limit on this privilege.  "[T]here is no fixed number of years that can measure the duration of the privilege."  <u>Nixon v. Freeman</u>, 670 F.2d 346, 356 (D.C. Cir. 1982).  "The confidentiality necessary to [a President's] exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic."  <u>Nixon II</u>, 433 U.S. at 449.  Berman has cited no case, nor could the court find one, where documents within the scope of the presidential communications privilege have been released in civil discovery due to their age.

Furthermore, the presidential communications privilege is a qualified privilege, assessed on the basis of a variety of factors, only one of which is age.  <u>In re Sealed Case</u>, 121 F.3d at 753-55.  In the context of civil discovery, a court must also assess the "public interests at stake in determining whether the privilege should yield in a particular case" and "must

specifically consider the need of the party seeking privileged

evidence." Id. at 746. Given the nature and purpose of the PDB,

the public's interest in protecting frank exchange between the

leadership of the CIA and the President could not be greater.

Thus, as the court in Lardner notes:

> even if there were support for the argument that the
> executive privilege for a document significantly erodes
> after 15 years, that would not end the Exemption 5
> inquiry. Plaintiff would still need to demonstrate that
> the privilege erodes to such a degree that -- even after
> one sets the age of the document alongside all of the
> other factors that bear on the assessment of the
> privilege -- the documents would still "normally" or
> "routinely" be disclosed.

Lardner, 2005 WL 758267, at *13. Berman has not shown that the

age of the two PDBs is such that the presidential communication

privilege would normally and routinely be disallowed in civil

discovery despite all other considerations that might support the

privilege.

For these reasons, the court finds that these documents are

normally or routinely covered by the presidential communications

privilege and exempt from FOIA under Exemption 5.

IV.

The FOIA requires that "[a]ny reasonably segregable portion

of a record shall be provided to any person requesting such

record after deletion of the portions which are exempt." 5

U.S.C. § 552(b). "It is reversible error for the district court

to simply approve the withholding of an entire document without

entering a finding of segregability, or the lack thereof, with

respect to that document." Wiener, 943 F.2d at 988 (internal

1   citations omitted).  "[A]gencies are required to provide the

2   court with facts which will enable it to make that

3   determination."  Bay Area Lawyers Alliance for Nuclear Arms

4   Control v. Dep't of State, 818 F.Supp. 1291, 1300 (N.D. Cal.

5   1992) (emphasis in original omitted).  Courts have found CIA

6   affidavits insufficient where the affidavits fail to address

7   whether the disclosure of substantive information may be possible

8   without the disclosure of a source or method.  Ray v. Turner, 587

9   F.2d 1187, 1196 (D.C. Cir. 1978)

10      Berman argues that the CIA's declaration lacks sufficient

11  detail to establish that no segregable portions of the requested

12  documents exist.  (Pl.'s Mot. at 26.) The court disagrees.

13  First, because the PDB is itself an intelligence method, the

14  release of any portion of the requested PDBs necessarily

15  constitutes information about the application of an intelligence

16  method.  (Def.'s Reply at 24.)  Second, any intelligible

17  information that is not classified is nevertheless part of a

18  mosaic of PDB information that could provide damaging insight

19  into how the CIA conducts its intelligence business.  (Id.)

20  Finally, the presidential communications privilege applies to

21  documents in their entirety.  In re Sealed Case, 121 F.3d at 745.

22  Therefore, the court finds that the requested documents are not

23  segregable and are exempt from FOIA in their entirety.

24  ///

25  ///

26  ///

V.

The court finds that the requested PDBs are excluded from the FOIA under Exemptions 3 and 5.  Accordingly, the court GRANTS the CIA's motion for summary judgment and DENIES Berman's summary judgment motion.  The clerk shall enter judgment.

IT IS SO ORDERED.

Dated: 7/11/2005



DAVID F. LEVI
Chief United States District Judge